Your Honor, the issue in this case, of course, is whether the New Jersey courts acted contrary to or unreasonably applied clearly established federal law set forth by the Supreme Court when they found that the pretrial publicity in this case was so inflammatory as to create a presumption of prejudice, but nevertheless refused to change the venue of the trial, but instead used what they called a trial management technique of bringing in a foreign jury. I'd like to begin by noting what is not at issue in this case, and that is the State is not challenging the State court fact-finding that the publicity in this case was, in fact, so intense and inflammatory as to create a presumption of prejudice. Their position and that of the district court is that presumptive prejudice doesn't matter, that only actual prejudice is sufficient to establish a Sixth Amendment violation. I find that position to be surprising in that there is no law whatsoever to support it. The Supreme Court has held in numerous decisions that either actual prejudice or presumed prejudice is sufficient to warrant a change of venue. In the case of Skilling v. United States, which is presently before the Supreme Court of the United States. Not on this issue, though, is it? Well, actually, this one. Is this one of the issues on which they granted cert? The issue in Skilling is... It's the honest services issue, isn't it? That's one issue. The second issue in Skilling is whether a presumption of prejudice may be overcome during jury voir dire. Two circuits, the Fifth and the Eleventh Circuit, have held that it may be overcome by juror responses. A number of circuits, including this court, have held that it may not be overcome, or at least have said that. There is no circuit, however, which has held that actual prejudice is required to mandate a change of venue. Is Skilling a direct appeal or an AEDPA case? Skilling is a federal appeal. It is a direct appeal. Not an AEDPA case? Not an AEDPA case. Is this an AEDPA case? Yes, this is an AEDPA case, Your Honor. Are the standards of review between AEDPA and direct appeals quite different? Oh, definitely, Your Honor, and that's why I began my presentation by noting that the question in this case was whether or not the decision of the New Jersey Supreme Court was contrary to or an unreasonable application of established federal law. Do you know of any Supreme Court case that holds that which you would like us to hold? In other words, that the bringing in of a jury from another district after checking the jurors out to see if they were tainted is unconstitutional? That that deprives a defendant of his or her fair jury trial? What does that sound like, Michael? Okay. Okay, I can't cite a case for you because there is absolutely no federal case whatsoever holding that a foreign jury is an adequate substitute for a change of venue. But then... That's it. Go ahead. You can ask. Isn't that the end of the matter? I mean, in interpreting AEDPA cases, correct me if I'm wrong, but my reading of them is that the Supreme Court has held clearly established law of the Supreme Court means holdings of the Supreme Court. So in order for you to prevail here, there would have had to have been a holding of the Supreme Court to the effect that when the local jury pool is polluted, it is constitutional error to import a jury from a neighboring jurisdiction. Well, I would disagree with that. An untainted jury. Right. Right. Untainted sounds better than polluted. Thank you. I would disagree with that, Your Honor. The clearly established federal law is that when there is a presumption of prejudice due to the pretrial publicity, you must move the venue of the trial away from the source of the contamination. But the cases you cite for that proposition weren't cases where the judge brought in untainted jurors from elsewhere. Those were cases where they went ahead with tainted juries. That's absolutely true. But the Supreme Court has said in a number of decisions, for example, in Ervin, they said the defendant must be tried in an atmosphere undisturbed by so huge a wave of public passion. When you bring in foreign jurors, you're bringing them in to the contaminated atmosphere. The Supreme Court has said that the goal is to move the trial away from where the publicity originated to a place less exposed to the intense publicity. The New Jersey Supreme Court in this case found that the principal risk of jury contamination arose in Mercer County. It makes no sense to bring people into the source of contamination rather than taking them away from it by moving the venue of the trial. But you're speaking as if the source of the contamination is some sort of cloud that hangs over the county and goes with the land. Right, runs with the land. I mean, isn't what's important here that the jurors that sit in judgment of your client are not tainted by the fairly pervasive and awful publicity that came with this case? Well, the whole purpose of a presumption of prejudice is to create a presumption because you realize that the juror responses cannot be taken at face value. As this court has said in three separate en banc opinions, adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they may be impartial should not be believed. So, and I would point out that there's another factor in this case, and that I believe is very significant. In this case, of course, we're not dealing just with pretrial publicity. The New Jersey Supreme Court found that there was substantial mid-trial publicity. Among other things, it found that the inflammatory publicity continued throughout the trials. Pervasive media publicity surrounded the conduct of the trial. Dramatically prejudicial headlines were attendant to the guilt phase deliberations. Headlines such as, you know, in the middle of the trial, a headline that said, he did it. And then during the jury deliberations, headlines like this one. This is DT38, one juror stalls verdict. Clearly, the Trentonian was not merely reporting on what was taking place in this trial. It was trying to influence the jury verdict by putting pressure on the hold, what they perceived to be the holdout juror. In fact, this article even contains discussions of what the sources, their sources had said about the status of the jury deliberations. I would point out that Estes versus Texas, Shepard versus Maxwell, those were cases in which there was substantial mid-trial publicity, which led to the finding of the, the defendant being received an impartial jury. Mr. Smith, I wonder if the problem here is, that is the problem from your perspective. I wonder if the problem isn't that we are to be persuaded that the Supreme Court has or you import a jury from elsewhere, but that where the, where the cloud is so great, you have to move elsewhere. Aren't we in a situation in which the court has contemplated an either-or remedy, and the case we have before us is one in which the Supreme Court would have to be persuaded that, that, that a change of venue is mandated, that it's not sufficient in this context. No, I don't believe, so as I said before, you know, these Supreme Court decisions have talked about moving the trial away from the source of the contamination. For example, one of the, these cases, Estes versus Texas, they moved the trial to a venue 500 miles away, and the Supreme Court said that still wasn't enough, there should have been a second change of venue even further away. So my position is that they've clearly said that if there's presumptive prejudice, you've got to either do one of two things, you've either got to move the trial away, or if the perhaps this presumption of prejudice could be overcome, but certainly the New Jersey courts did not hold that it was overcome here, they didn't apply the presumption of prejudice. Dr. Smith, didn't your client ask for an either-or remedy initially, didn't he ask initially that you should have a change of venue, or import jurors? Well, I wouldn't describe it as either-or, the motion was for a change of venue, or in fact, the alternative for a foreign jury. I don't know why that, why an alternative is not an or. Well I think that the initial request was for a change of venue, in fact, they made the request. It's because the Supreme Court hasn't yet said or is the same as alternative. Okay, well they've made, they made the request for a change of venue actually three different times. First before, you know, an initial part of the motions, then after the remand from the appellate division, they, in July of 1995, they made it, they clarified that their request was for a change of venue, then during this election in Burlington County in December of 1995, they again moved to have the venue moved out of Mercer County. There's no question that you have preserved this issue, I don't think anybody says otherwise, but what are we to do with the decisions of the appellate courts in New Jersey in this very case? I mean, don't we have to give some deference to them? Those decisions are contrary to or an unreasonable application of any number of Supreme Court cases. Yeah, but as Judge Hardiman asked you, the Supreme Court cases aren't, don't present this precise issue. There are cases in which the adverse, terrible, and in this case, there's no question, the pre-trial publicity was terrible, but those cases aren't, didn't go through a state Supreme Court. Well, you know, but you're talking about basically what is a, just a question of fact, I mean in some of these other cases, basically their, the state response was, well, we, you know, we had sequestration of the jury or, you know, we had whatever devices that the judge may have taken, but the Supreme Court said that wasn't enough. And that's- Because they were, they were, I mean, there's no question in my mind that we might look at this case differently if it was a federal trial, but it's not a, a federal trial. And so, it does put you in a somewhat different position, doesn't it? It certainly does, but I think that I've met that standard, Your Honor. Mr. Smith, you quite properly were quoting EDPA as contrary to or an unreasonable application of. I, I take it you're not seriously contending that what happened in New Jersey was contrary to what the Supreme Court has said. Your, your argument would be confined to what, whether it's a reasonable application, would you not say? Well, Your Honor, before I answer that question, I would note that my red light is on. No. You can answer the question. Okay. Well, no, I, I've argued in my brief and my position continues to be that it is contrary to, because the rule is very clear that if there's presumptive prejudice or actual prejudice, either one requires a change of venue. So that, the New Jersey decision using the state trial management technique was contrary to that rule. Thank you very much. Thank you, Your Honors. We'll get you on rebuttal, right? You've saved time. Thank you, Your Honors. Daniel Bornstein, Deputy Attorney General, on behalf of the appellees in this matter. Mr. Bornstein, this was terrible publicity. I don't know what the newspaper had in mind. Well, it wanted him to get the death sentence. He did get the death sentence. New Jersey did away with the death sentence, which is the only reason the case is before us. He wouldn't be before us, I guess, now. So, it really was terrible. How can you get us to justify or affirm that which the district court did, which the state court did? Well, I think that the court employed a trial management technique to deal with the issue of the pretrial publicity. The court recognized that the pretrial publicity was inflammatory and was extreme. And the court recognized that because of that pretrial publicity, there may be some difficulty getting a fair and impartial jury from the jury pool in Mercer County. So, what the court did was, it granted defendants' request to change, excuse me, not to change venue, but to impanel foreign jurors. The defendant specifically asked the court to either change venue or import foreign jurors. The first time, not the second and third time, right? And that was the first request. I don't think that alternative was posed by the defendant in the subsequent request for a change of venue. Am I correct as to the facts? What happened was the defendant initially requested a change of venue or in the alternative impanelment of a foreign jury from Camden County. Ultimately, he got impanelment of a foreign jury from Burlington County. You know, I meant to bring my New Jersey map with me. I don't know the counties well enough. Mercer County is where Trenton is. Correct. Which is where the crime, terrible crime happened. Correct. How far away is Burlington County? Is it a contiguous county? It is a contiguous county. The trial court considered a number of factors in settling on Burlington County. And one of the factors was the close proximity between Burlington County and Mercer County. They are contiguous. The defendant was requesting impanelment of foreign jurors from Camden County. And on his interlocutory appeal, he asked the appellate division to designate Camden County as the source county. Did the state object to Camden County? The state objected to the use of a foreign jury. And the state took the position that the defendant could get a fair and impartial jury in Mercer County. At one point, the judge picked a jury that didn't have many African Americans. It wasn't really racially diverse. Correct. And then that got overturned. And then they ended up with Burlington. Did the state ultimately approve Burlington? Or did you always say, don't import anybody? The state took the position that the defendant could get a fair trial in Mercer County. And that an attempt should be made to seat jurors from Mercer County. And even when the matter went on appeal to the appellate division, the state still took that same view. And, in fact, cross-appealed from the trial court's decision to impanel a foreign jury. But the state lost that in the appellate division. And the appellate division said that the trial court properly exercised its discretion in deciding to impanel foreign jurors. Now, what were the steps that the trial judge took to try to insulate the jurors from this continuing inflammatory publicity? Well, for one thing, Your Honor, at the outset, the judge took steps to ensure that no one on the jury had been exposed to any of the publicity that had been going up till that point. Okay. But then the judge took other steps. Correct. Which were? For one thing, the judge repeatedly advised the jurors, not only at the outset, but all throughout the trial, that they could not expose themselves to any publicity about the case. No, the judge did more than that. Correct. The judge had the, and I expected you to say, the judge had the jurors picked up at the courthouse in Burlington County so that they wouldn't have to go through, so that they could avoid seeing these headlines that people were hawking. Isn't that correct? That's correct. I was getting to that, Your Honor. Oh, you are? Good. The court had the jurors report every day to the Burlington County courthouse in Mount Holly. There they were picked up. They were shuttled to Trenton every day. And the driver of the shuttle used a route that was specifically designed to avoid the possibility that the jurors would be exposed to any headlines from the Trentonian. Significantly, at a number of occasions during the course of the trial, the defense asked the judge to question the jurors whether they had seen any headlines in the Trentonian. I think Judge Pollack has a question brewing. Mr. Bornstein? Yes. Judge Sloviter and Judge Hardiman have both made the point in questions to your adversary that we here have a state case which comes in a different posture from a federal case because of AEDPA. Correct. If this were a federal case, would you not agree that this court or the Supreme Court would not find what happened below to be satisfactory in a due process sense and would have vitiated the conviction? I would not agree, Your Honor. Even if this were a federal case, the defendant's right to a fair trial by a fair and impartial jury was satisfied here because we were able to select jurors from Burlington County who had not been exposed to any of this inflammatory pretrial publicity. And significant steps were taken to ensure that those jurors were not exposed to any ongoing publicity during the trial. And there is absolutely no evidence that any of the jurors were exposed to any publicity concerning this case, either pretrial publicity or mid-trial publicity. Every single time the judge asked the jurors whether they had been exposed to any of the headlines, no juror indicated that he or she had been exposed to the headlines. Of course, the jury did. Was it the jury that came up with death as a penalty or was that the judge? The jury. So one would expect Mr. Smith would say, see, it's obvious that the jury was affected by the inflammatory headlines. The defendant got the death penalty because he committed one of the most heinous crimes that has ever been committed in New Jersey. The jurors found that the two aggravating factors outweighed the mitigating factors and that a death sentence was appropriate. The jury was specifically told that they had to base their verdict on the evidence and only on the evidence. And the jurors are presumed to have followed the court's instructions. There is absolutely no reason to doubt that the jury's verdict was based on the evidence and not on any publicity, either pretrial publicity or mid-trial publicity. Do you have any questions? I would just emphasize again. You still have time. Thank you, Your Honor. But you don't have to fill it up. Just briefly, I would emphasize. It's not like nature abhors a vacuum. I think during the questioning earlier today, the court focused in on the key standard of review here. And that is whether the state trial court's decision in granting the defendant's alternate request for impanelment of a foreign jury, whether that decision was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Suppose the Supreme Court decides Skilling on the second question. I always think of Skilling as an honest services case because we have that issue.  But suppose the Supreme Court says that the presumption of prejudice cannot be overcome during voir dire. What does that do to your argument? It would do nothing to my argument, Your Honor. The issue in Skilling is not the issue before this court. It's not the issue in this case. Skilling was tried in Houston. He did not get a change of venue and he didn't get a foreign jury. He was tried before a jury that was drawn from a pool of jurors in the very county that was considered to have been the subject of massive pretrial publicity. Why don't you tell us why the judge didn't change the venue? I mean, what you argued to the judge not to change the venue. The court felt that impanelment of a foreign jury was a reasonable alternative to a change of venue. We know that, but what are the reasons that led the judge? What did you argue before the judge not to change the venue? You or one of your colleagues? Well, Your Honor, this was a trial that took a total of two months to try. At the time, it was a capital case. It was a very complicated case. There were expected to be between 50 and 75 witnesses. Where did they come from? They all came from Mercer County. I would have expected you to answer that immediately to my question. Okay, so there was a question of how many witnesses actually testified on the prosecution side? I don't know. I don't know precisely, Your Honor. I think it was in the neighborhood of about 50 witnesses. The trial took almost two months. There were, I think, about 50 witnesses. They all came from Mercer County. The prosecutor's office was in Mercer County. All the interested parties, including the victim's family, was from near Mercer County. And it would have been very costly and very inefficient to change the county. Under New Jersey's court rules, the court had the discretion to impanel foreign jurors as an alternative to a change in venue. The court reasonably and prudently exercised its discretion, granted defendants alternative requests for impanelment of a foreign jury, recognizing that a change of venue would create significant, considerable hardship to the witnesses and the prosecutors and the citizens. Thank you. Oh, I'm sorry. I'm sorry. You mentioned the added expense and inconvenience that would come about from moving the trial. Do you think the added expense is a factor that this court should have in mind in determining the constitutional issues? This court can't interfere with the state court's determination unless it was clearly contrary to or in a reasonable application of clearly established federal laws determined by the United States Supreme Court. That sounds to me like an answer to a question I didn't put to you. Well, I think what I'm basically saying, Your Honor, is it really isn't relevant. It's not for this court to say, well, I don't know if I would do that. I don't know if I would have reached that same decision. I may have changed venue. That's not the issue here. It's not for this court to say, well, maybe the court shouldn't have considered the expenses and the inconvenience. It's only for this court to consider whether the state court's decision was contrary to or in a reasonable application of clearly established federal law as determined by the United States Supreme Court. And in this case, we have a situation where the United States Supreme Court has never addressed this issue. No federal court, let alone the United States Supreme Court, has ever suggested that when you have a situation with pretrial publicity generating a presumption of prejudice, a change of venue is constitutionally required and empanelment of a foreign jury is never adequate. Can I rework Judge Pollack's question? Would it make a difference? Should we consider whether the state trial judge appropriately considered expense as one of the factors in deciding not to transfer the venue? The short answer would be no, Your Honor. Thank you. Thank you. I hope you'll understand that my facetious remark a few minutes ago is not intended to be in any way disparaging of what I think is an excellent argument that you made, quite on the same level of excellence as Mr. Smith's argument. Thank you, Your Honor. Okay. Thank you. Thank you. Mr. Smith, you have rebuttal. Your Honor, I have a few brief points I'd like to make. You'll have to speak up so we can get you. You know, the microphone is not only so we can hear you, it gets you on tape. Okay. On disc now. I'm sorry, Your Honor. First of all, the prosecutor suggested that none of the jurors had been exposed to this publicity. I would point out that that is not accurate, that, in fact, the Trentonian was sold right next to the jury room in Burlington County. The jurors, a number of them, prospective jurors, mentioned that they had seen it in the jury room, that there had been a number of discussions about it. Excuse me. Are you saying there was evidence that the Trentonian was actually in the jury room? Well, in Burlington County where the jury was selected, it was. Oh, but there was no evidence. Was there that the Trentonian was physically in the jury room with the jurors? Not in Mercer County, no. Oh, okay. There was, however, Justice Handler, in his dissent, noted that nine jurors had some familiarity with the case, including five that seemed to have fairly significant knowledge of the case. I would also note that, in its opinion, the Supreme Court of New Jersey recognized that the federal standard is that a change of venue is required for either presumed or actual prejudice, and it said the federal standard for reversal of a state court conviction should not be confused with the state standard for granting a change of venue. So that's where I get my argument that the decision of the New Jersey court was contrary to the federal law. But the statute doesn't say federal law. It says Supreme Court decision. Yes, it does, Your Honor. Federal law is a lot broader. Thank you, Your Honor. Thank you, Mr. Smith. Did I stop you in the middle of a sentence? No, the red light came on. That's what stopped me. Okay. Thank you. Thank you, gentlemen. It is well argued, and we will take this matter under advisement, and we'll hear from counsel in Scheinberg v. Sorensen.